## DISTRICT COURT OF SOUTHERN DISTRICT OF NEW YORK

MARY ABISHIER,

       Plaintiff,

   vs.

SUNSET RECORDINGS,

      Defendant

Case No.: 1:14-CV-03227-JSR

### NOTICE OF FILING & CERTIFICATE OF SERVICE

### NOTICE OF FILING

To: **ATTORNEY FOR PLAINTIF**
**MARY ABISHIER**
Mr. Mathew Levine, Esq.
Ms. Mary Abishier,
Mr. Patrik Nilssen,
Panjoma
300 Darnell Drive
Austin, Texas 78745

### CERTIFICATE OF SERVICE

    I do hereby certify that a copy of this LEGAL DOCUMENT was delivered to the Southern District Court System via the Online system and it s been confirmed it was accepted by that system, and was to sent to the Plaintiff (with tracking confirmation and Signed Services) by mail service (with tracking information), postage pre-paid, to the above-referenced persons at the above-referenced physical address and to the Plaintiff by email, on this /9, day of /AK/2014.

                    Dated this /5 th day of /AK/ 2014

## DISTRICT COURT OF SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MARY ABISHIER, PATRIK NILSSEN, PANJOMA, et al.,** )<br>)<br>) Case No.: 1:14-CV-03227-JSR<br>) | |

MARY ABISHIER, PATRIK NILSSEN,
PANJOMA, et al.,                          ) Case No.: 1:14-CV-03227-JSR
                                          )
        Plaintiff,                        )    **MOTION TO ADD NOT ONLY ALL**
                                          )    **EXECUTED CONTRACTS BY THE**
                                          )    **PLAINTIFF AND BY THE DEFENDANT, A**
        vs.                               )    **MOTION TO ADD A THIRD FULLY**
                                          )    **EXECUTED CONTRACT AND A SECOND**
SUNSET RECORDINGS, INC., SUNSET           )    **FULLY EXECUTED 'MASTER USE**
MUSIC PUBLISHING, SUNSET CONNECT,         )    **LICENSE' TO THE ENTIRE COMPLAINT**
S2 ENTERTAINMENT, INC. and DON            )    **AND TO SECTIONS 25, 26, 27, 28 and**
LICHTERMAN, et al.                        )    **SECTIONS 44, 46, 47 and ALL COUNTS**
                                               **RELATING TO IT**
        Defendant

_____

    Defendant SUNSET RECORDINGS, INC., SUNSET MUSIC PUBLISHING,
SUNSET CONNECT, S2 ENTERTAINMENT, INC. and DON LICHTERMAN COLLECTIVELY
KNOWN AS SUNSET, et al., hereby submit their MOTION TO ADD NOT ONLY
ALL EXECUTED CONTRACTS BY THE PLAINTIFF AND BY THE DEFENDANT, A MOTION
TO ADD A THIRD FULLY EXECUTED CONTRACT AND A SECOND FULLY EXECUTED
'MASTER USE LICENSE' TO THE ENTIRE COMPLAINT AND TO SECTIONS 25, 26,
27, 28 and SECTIONS 44, 46, 47 and ALL COUNTS RELATING TO IT.

## MOTION TO ADD NOT ONLY ALL EXECUTED CONTRACTS BY THE PLAINTIFF AND BY THE DEFENDANT, A MOTION TO ADD A THIRD FULLY EXECUTED CONTRACT AND A SECOND FULLY EXECUTED 'MASTER USE LICENSE' TO THE ENTIRE COMPLAINT AND TO SECTIONS 25, 26, 27, 28 and SECTIONS 44, 46, 47 and ALL COUNTS RELATING TO IT

        The defendant wishes the court to add the following 'fully
executed' 'Master Use License' document along with all of the 'fully
executed contracts' mentioned in the complaint, however the second
master use license contract (American Drug War: The last White Hope
Soundtrack CD) has been left out of he entire complaint.

        Therefore, the court must recognize there are now THREE (3)
fully executed contracts which is to point to the entire claim and to
also point to what was agreed upon in section 28.


        The defendant had lumped the TWO (2) Master Use License
deals as one, however, it lost track that the opposing council and the
Plaintiff are dishonest people that are filing false claims vs. this
defendant.

# DISTRICT COURT OF SOUTHERN DISTRICT OF NEW YORK

Therefore, anything relating to the Master Use License agreements in Sections 5, 26, 27, 28 and in Section 44, 46, 47 must reflect this 'fully executed' contract.

This also compounds that the content in Section 46 needs to be stricken from the complaint because its a false claim.

1. The Plaintiff states in SECTION 46 "According to the most recent purported royalty statement provided by Defendants, dated September 4, 2013, (as reflected in the below excerpt), Defendants illegally sub licensed both "Reel" and "Subaquatic Cellular Supersmile" when you can see these fully executed contracts are as follows in Exhibit A.

2. The Defendant must repeat that leaving out the one Master Use License is yet another ploy to manifest what is another False claim that regardless of any of it, this needs to be stricken from this complaint.

3. In Section 28 of that complaint, the Plaintiff states it had fully executed two contracts. The Plaintiff had executed a total of THREE (3) contracts (Exhibit A)

4. The Plaintiff now must state that it had signed the fully executed contracts that are in Exhibit A here in these attachments.

5. The Plaintiff now must state those contracts are the ones that gave whomever the ability to use the song "Reel" in that How Weed Won The West Soundtrack CD and then it also is a contract that allows the use of the "Subaquatic

# DISTRICT COURT OF SOUTHERN DISTRICT OF NEW YORK

Cellular Supersmile" in that American drug War: The Last White Soundtrack CD.

## CONCLUSION

This law firm and this Plaintiff is making a claim in this court in that section that the Defendant had infringed with its copyrights stating it was not allowed to use them in the soundtrack CDs listed in Section 46, when that is a false claim.

This law form and this Plaintiff had admitted to signing this deal in section 28 of the initial claim however it had executed a total of THREE (3) contracts.

Furthermore, the head of the Tunecore company has given the Plaintiff and this court a precise statement many times about how it gets paid and then in turn how it paid the Plaintiff.

The court must strike everything in this section 46 because its a false claim and it must acknowledge that 'fully executed' master use license for the usage of the sound recording in that soundtrack and/or in both soundtracks

Overall, this court must recognize the signed and/or 'fully executed' contracts that were of course signed by both parties which again, need to be amended and added to to this overall complaint (Section 28) set up by the Plaintiff, and therefore, all of those contracts clearly state that the defendant can indeed use any of its sound recordings of those particular Soundtrack CDs or Compilations CDs it had listed in Section 46 of the complaint.

## DISTRICT COURT OF SOUTHERN DISTRICT OF NEW YORK

This statement made up by the Plaintiff about the defendant not having permissions to use them on the two soundtrack CDs are bold faced lies that had already been admitted to in many other Claims and most of all, it is clearly stated on that master Use Agreements attached here in this motion.

The court should now strike all of this information relating to any of these false claims in Section 46.

Besides, the Plaintiff is making a claim that it clearly allowed after it signed both of the fully executed contracts (Section 28) while leaving a third one to help compound its lies and false claims in the various sections it lists it had been infringed upon that way.

Regardless, this is another addition that needs to be formally added to the 'answer" to the 'statement of fact" to the 'replies" to any motions and most of all, to the court AND TO THE COMLPAINT.

And, this is a corrupt court if it allows the Plaintiff to literally leave out a fully executed contract so it can use that false claim against the defendant in its many claims in this very complaint.

The court must now strike and delete the false statements and these false claims that the Plaintiff lists in that SECTION 46 in its initial claim. The court strike the entire Section 46 from this claim its such a false claim. The court must also add or amend the Sections 5, 26, 27, 28 and in Section 44, 46, 47 which now must reflect this THIRD (3) 'fully executed' contract.

BY:   *DON LICHTERMAN*
      **SUNSET RECORDINGS, INC.,**
      **SUNSET MUSIC PUBLISHING,**
      **SUNSET CONNECT, S2**
      **ENTERTAINMENT, INC. and DON**
      **LICHTERMAN, et al.**

This **Sunset Connect/Sunset Recordings, Inc.** "Digital Distribution" Agreement (hereinafter referred to as the "Agreement") is made effective this **1** day of **OCTOBER, 2010** by and between **MARY PANJOMA, PATRIK NILSSON, RITCHN, P.K.A. PANJOMA** located at **3211 DARNELL DRIVE, AUSTIN, TEXAS, 78745** (hereinafter referred to as "Content Owner") and **Sunset Connect/Sunset Recordings, Inc.**, located at 410 Park Avenue, 15th Floor, Suite 1530, New York City, NY 10022 USA and distributed with **Universal Motown (UniMo Digital)** (hereinafter referred to as "Distributor"). Distributor is a record Content Owner and technology solution provider, which offers sound recordings for distribution including, but not limited to, internet downloads (DPD "Digital Phonorecord Delivery"), and online retail outlets. Content Owner owns or has the right to distribute the master sound recording(s) that are delivered to Distributor (hereinafter referred to as Licensed Recordings).

In consideration of the respective covenants herein, the parties hereto, intending to legally bind, hereby agree to the following;

## I. Terms

The Term of our Agreement shall commence on the Effective Date and shall continue unless and until terminated by either party upon no less than thirty (30) days notice to the other party.

## II. Definitions.

   **a.   Modified Definitions**. The capitalized terms as contained in the Agreement and listed below, are hereby the following definitions:

**"Accounting Period"** shall mean each calendar quarter.

**"Approved "Device" or "Approved Devices"** shall mean any electronic device that supports the DRM, including, but not limited to the Net MD, HiMD, and Memory Stick.

**"Artwork"** shall mean the album cover packaging and artwork associated with the current album release of a Sound Recording, which may also include liner notes, promotional items and lyrics, all the rights to which have been cleared by Content Owner for use by Sunset Connect  under this Agreement as such artwork is provided by or on behalf of Content Owner.

**"Codec"** means compression/decompression algorithm(s) that are used to compress and decompress data and that are utilized in connection with all Online Stores and/or Subscription Services.

**"Content"** shall mean each Sound Recording, video (where such videos are provided by Content Owner to Sunset Connect  for use hereunder and/or in connection with all Online Stores and/or Subscription Services), Metadata, Preview Clips, Download, Conditional Downloads and any other content provided by or owned or controlled by Content Owner, that are provided by or on behalf of Content Owner, the rights to which have been cleared by Content Owner, so that Content Owner may grant authorizations and the rights granted to Sunset Connect  hereunder.

**"Content Usage Rules"**  shall mean those permissions set forth on Exhibit A to this Agreement governing rights and/or obligations in and/or associated with the use of any Digital Download.

   **"Content Owner Proportionate Share"** shall mean, for each Accounting Period, and for each territory that is separately accounted for, a fraction:  (i) the numerator of which will be the total number of Conditional Downloads of Content Owner Sound Recordings that are downloaded by End Users during such Accounting Period in such territory; and (ii) the denominator of which will be the total number of Conditional Downloads downloaded by End Users of all Sound Recordings (including Content Owner Sound Recordings) during such Accounting Period in such territory.

**"Conditional Download"** shall mean digital downloads that are time-limited by the DRM.

**"Download(s)"** shall mean a permanent, resident copy of an audio or audio-visual file that may be perceived using a personal computer "**PC**", Portable Device, or Video Device by an End User. Shall mean an electronic transmission of data (or digital file(s)) which results in the creation of a permanent digital copy of a Sound Recording where such Sound Recording is 1) provided by Content Owner to Sunset Connect  under this Agreement for distribution and/or sale and 2) wrapped in the DRM.

©2009 Sunset Recordings, Inc. – All Rights Reserved.  Proprietary and Confidential – Not to be Distributed                    Page 1

b.    Perform and make available for promotional purposes, portions of Your Authorized Content ("Clips") by "streaming" to promote the license, sale and distribution of Digital Masters;

c.    Promote, sell, distribute, and deliver Digital Masters, as individual tracks or entire albums, and associated metadata to purchasers who may use such Digital Masters in accordance with usage rules agreed by us;

d.    Use and authorize others to license the use and sale of Your Authorized Content in connection with all manner of phone services, such as, but not limited to, sales or licenses of Digital Masters as downloads (including, without limitation, downloads to cell phones) and for use as ringtones and ringback tones;

e.    Use so-called "kiosks" to distribute, market and promote Digital Masters, including, without limitation, by allowing the burning of compact disc copies of any Digital Master or by allowing a copy of a Digital Master to be transferred to personal devices;

f.    Use and authorize others to allow copies of a Digital Master to be distributed as so-called "conditional" downloads, whether tethered to a device, time limited, play limited or otherwise;

g.    "Stream" and authorize others to "stream" Your Authorized Content, either on-demand or as part of an internet radio service;

h.    Use and distribute Copyright Management Information as embodied in a Digital Master;

i.    Display and electronically fulfill and deliver Authorized Artwork used in connection with the Your Authorized Content for personal use solely in conjunction with the applicable Digital Master as provided herein;

j.    Use Your Authorized Content, and Authorized Artwork and metadata as may be reasonably necessary or desirable for us to exercise our rights under and in furtherance of this Agreement;

k.    Authorize our Licensees to perform any one or more of the activities specified above.

l.    stores the eRecords on one or more servers;

m.    display and use Content Owner's Artwork to sell and promote the sales of eRecords;

n.    transfers the Artwork to Approved Devices which are integrated with all Online Stores and for promotional use;

## 1.1   Licensed Recordings

Content Owner hereby grants to distributor the exclusive right and license during the Term of Grant throughout the Territory to make, cause or otherwise effect Digital Audio Transitions and digital Phonorecord Deliveries of the Licensed Recordings. The term "Digital Audio Transmission" shall mean a transmission that embodies a sound recording. The term "Digital Phonorecord Delivery" shall mean each individual delivery of a phonorecord by digital transmission of a sound recording, which results in a specific identifiable reproduction by or for any transmission recipient of a phonorecord of that sound recording.

Metadata may be delivered by Content Owner to Sunset Connect in one of the following ways: 1) on the CDs; 2) in an Excel or CSV file; 3) in a XML file; or 4) via a third party Metadata supplier.  To avoid cumbersome Metadata matching, any Metadata must be delivered in a single source.   Any Metadata must accompany the Content Owner.wav file or other formatted file at the time of submission. If the CD or metadata delivered with the CDs does not have an ISRC code or a UPC code, Sunset Connect will assign its own unique identifier for purposes of identifying the sales of particular eRecords in the Royalty Reports (as defined below). Content Owner (or an authorized third party on behalf of Content Owner) shall commence delivery of the Sound Recordings promptly after the Effective Date.   Content Owner shall deliver its   catalog of newly released Sound Recordings (including newly-cleared titles of back catalog) during the Term, no later than when Content Owner first makes such Content  publicly available through or via any other online store(s), web site(s), or retail chains (e.g., in store, on air, "street" or release date).

Any content will be encoded in accordance with the specifications set forth in Exhibit A, attached hereto and incorporated herewith by reference.  Content Owner will comply with Sunset Digital's "Content Delivery Guide "Sunset Connect  will not knowingly impair, alter, or defeat a watermark in the Content. Content Owner agrees to test all music encoded by Sunset Connect  or its third party designee for quality and accuracy and shall communicate any exceptions or corrections to Sunset Connect  in writing within five (5) days of the date upon which the encoded music is uploaded. Sunset Connect  shall retain any CDs delivered to it pursuant to this Section 3 for purposes of maintenance and backup.

## 4. Marketing and Promotion

### 4.1    Use of Names, Likeness and Artwork
Solely for the purpose of promoting the sale of Licensed Recordings hereunder, Content Owner hereby grants to Distributor, its licensees and assigns the non-exclusive gratis right and license during the Term of Grant, throughout the Territory to use, reproduce, display, perform, distribute, transmit, publicity and privately, by and all means and in any and all media known or hereafter devised (1) the names, approved lifelessness and biographical information (including, professional, group, and other assumed or fictitious names), of any and all persons performing on or rendering services in conjunction with the creation of the Licensed Recording (collectively, "Name and Likeness"); (2) any artwork, drawings, photographs, liner notes, or other graphical material (collectively "Artwork"). Content Owner furnishes to or identifies for Distributor's use hereunder, and (3) any trademarks, service marks or trade names embodied in the foregoing.

### 4.2    Marketing and Promotion Activities
Content Owner recognizes and acknowledges that the distribution of Licensed Recordings via the internet is speculative by nature and agrees that the reasonable business judgment of Distributor, its subsidiaries, dealers, distributors, affiliates, agents, and licensees shall be final with respect to such matters. Nothing in this agreement shall be construed as an obligation; guarantee or commitment by Distributor to undertake any degree of marketing of the Licensed Recordings and Distributor has not made, and does not hereby make, any representation or warranty with respect to the amount of revenue or royalties Content Owner shall accrue hereunder.

## 5. Consideration – Royalties

Distributor shall pay Content Owner a royalty based on a percentage of the sales price specified for each Licensed Recording download. The Content Owner will identify the sales price for each Licensed Recording at the time of delivery. The Content Owner will also indicate which distribution method(s) may be used for each Licensed Recording at the time of Delivery. Distributor shall pay Content Owner a royalty for each purchased download that occurs for any Licensed Recording. No fees or royalties  shall be payable hereunder to Content Owner for; (1) a Digital Phonorecord Delivery made available for a "Free" or "No Charge" basis for the purpose of promoting Licensed Recording, and/or promoting services of Distributor; (2) so-called "streaming" transmissions of Licensed Recordings made available on a "Free" or "No Charge" basis for the purpose of promoting Licensed Recordings, and/or promoting the services of Distributor; (3) incomplete, aborted or non-functional Digital Phonorecord Delivery of a particular Licensed Recording to a given end user.

make any claim, nor shall any liability be imposed upon Distributor, its subsidiaries, affiliates, dealers, distributors, agents, or licensees based upon a claim that more revenue could have accrued or better business could have been done than was actually accrued or done by Distributor, , its subsidiaries, affiliates, dealers, distributors, agents, or licensees hereunder; (6) Royalties payable to Content Owner hereunder includes all sums due to Content Owner, producers, directors, arrangers, performers, engineers and any other persons or entities engaged in connection with the creation of the Licensed Recording and Artwork. Content Owner shall be solely responsible for the payment of any royalties due such person or other third parties arising from payments made to Content Owner hereunder; and (7) all information Content Owner provided and will provide with respect to Licensed Recording is true, accurate and complete.

**8.2    Distributor**
Distributor represents and warrants that (1) Distributor has all necessary authorization, corporate and otherwise, to enter into this Agreement and to fully perform the terms hereof; (2) Distributor shall not license, sell, or distribute the Licensed Recordings, except pursuant to the terms of this Agreement; (3) the servers employed by Distributor to distribute Licensed Recordings and Artwork hereunder, and during the Term of Grant shall be located within the United States.

**9. General Provisions**
**9.1 Approvals**
Wherever Content Owner's approval or consent is required or requested hereunder, Content Owner shall provide Distributor notice of approval or disapproval, together with a statement explaining the reason for any such disapproval, within thirty (30) business days after Distributor requests same. If Content Owner shall fail to give such notice to Distributor as aforesaid, Content Owner shall be deemed to have given such consent or approval.

**9.2 Performance Rights.**
Content Owner, Unless Agreed Upon By Content Owner and Content Owner agrees to administer and pay Sound Recording performance fees for use the Content Owner Sound Recordings (such fees to be payable only to the extent that the Subscription Service incorporates Streaming functionality and Streams Content Owner's full length Sound Recordings to End Users).  Except as otherwise set forth above and in Section 5, performance rights shall be subject to the terms of the original Agreement.

**9.3    Modifications and Waiver**
This agreement shall not be modified, amended, canceled or in any way altered, nor may it be modified by custom and usage of trade of course of dealing, except by an instrument in writing and signed by duly authorized officers of both of the parties hereto. Performance of any obligation required of a party hereunder may be waived only by a written waiver signed by duly authorized officer of the other party, which waiver shall be effective only with the respect to the specific obligation described therein. The waiver by either party hereto of a breach of any provision of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach of the same provision or any other provision of this Agreement.

**9.4    Confidentiality Agreement**
Each of the parties to this Agreement shall not directly nor through an agent disclose, disseminate, or cause to be disclosed the specific Terms of this Agreement, except; (1) insofar as disclosure is reasonably necessary to carry out and effectuate the Terms of this Agreement; (2) insofar as a party hereto is required by law to respond to any demand for information from any court, government entity, or governmental agency; (3) insofar as disclosure is necessary to be made to a party's independent accountants for tax or audit purposes; (4) insofar as the parties may mutually agree in writing upon language to be contained in one or more press releases. Neither party shall issue a press release concerning this Agreement or the subject matter hereof without the prior written consent from the other party.

**9.5    Governing Law**
This Agreement shall be construed and enforced in accordance with the laws of the state of New York applicable to agreements between residents of New York wholly executed and

©2009 Sunset Recordings, Inc. – All Rights Reserved.  Proprietary and Confidential – Not to be Distributed      Page 7

DIGITAL DISTRIBUTION AGREEMENT                                    Tuesday, November 09, 2010

into this Agreement. No modifications or amendments of this Agreement or any of the terms or provisions hereof shall be binding upon either party hereto unless confirmed in writing by both parties. If a recognized court of law determines that any part of this Agreement is conflicting with the governing laws, then all other remaining portions of this Agreement shall inure and remain in affect through the duration of this Agreement. No waiver by any party hereto of any term or provision of this Agreement of any default hereunder shall effect such party's rights thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other similar default.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

AGREED TO AND ACCEPTED:

"Distributor"
**Sunset Connect / Sunset Recordings, Inc.**
410 Park Avenue
15th Floor, Suite 1530
New York City, NY 10022

BY: _____ (authorized signatory)
NAME: **DON LICHTERMAN**
TITLE: **CHAIRMAN / HEAD OF LABELS**
DATE: **2 October 2010** _____

"Content Owner"
**Content Owner Name:** Mary Abshier _____ **(Please Print Clearly)**
Address: _____ 3211 Darnell Dr. _____
Address: _____ Austin, TX _____
City – State – Zip _____ 78745 _____

BY: _____ (authorized signatory)
NAME: Mary Abshier _____
TITLE: Owner _____
DATE: 11/9/10 _____

Content Owner hereby grants Distributor the right to distribute Licensed Recordings via mail order CDs "On-Demand after authorization has been provided by Content Owner at the time of Delivery in writing.

_____          11/9/10
(Authorized signatory)              (Date)

Content Owner hereby grants Distributor the right to distribute Licensed Recordings via retail CDs after authorization has been provided by Content Owner at the time of Delivery in writing.

_____          11/9/10
(Authorized signatory)              (Date)

©2009 Sunset Recordings, Inc. – All Rights Reserved.  Proprietary and Confidential – Not to be Distributed

### MASTER USE LICENSE

This agreement ("Agreement") made on the **24** day of **SEPTEMBER, 2010** by and between **MARY PANJOMA, PATRIK NILSSON, RITCHN, P.K.A. PANJOMA** located at **3211 DARNELL DRIVE, AUSTIN, TEXAS, 78745** (hereinafter referred to as "Content Owner" and/or "Owners") and **SUNSET RECORDINGS, INC.**, located at 410 Park Avenue, New York, N Y 10022 USA (hereinafter referred to as "Licensee") for the following terms:

1.   LICENSE GRANTED:

    (a)   Whereby Owners are the owners of the certain master recordings described below. Owners, hereby grant to Licensee a non-exclusive license to use the master recording(s) embodying the performances of the artists(s) known professionally as PANJOMA _____ ("Artist") comprising the compositions (hereinafter "Compositions") listed on schedule "A" ("Licensed Masters(s)") annexed hereto and made a part of this Agreement, for the purpose of manufacturing, distributing and selling phonograph records, tapes and compact discs ("Records"). Under this Agreement Licensee is granted the limited right to include the Licensed Master(s): Reel in the following manner:  **How Weed Won The West Soundtrack (Sunset Urban)** (hereinafter "New Record").

    (b)   For and in consideration of the agreements set forth in this Agreement, Licensor agrees to pay Owner an advance in the amount of **$0.00**. Such payment shall be an advance against royalties payable hereunder and shall be charged against the record royalties or monies payable to Owner under this Agreement.

2.   RIGHTS GRANTED

    Owners hereby grant to Licensee the following right subject to the following:

    (a) The right to manufacture, distribute, sell, advertise, publicly perform and broadcast on a non-exclusive basis, Records containing the performance embodied in the Licensed Masters made hereunder.

(b)   The right to use the names, likeness and a biography of Artist in connection with the advertising, publicizing or sale of Records manufactured therefrom, provided that Licensee shall be bound by any restrictions imposed upon Owners with respect thereto of which Licensee shall have been informed by Owners in writing at the time of signing this Agreement.

(c)   Owners shall notify Licensee in writing at the time of executing this Agreement the owners of the Compositions and any Publishing Company owning any right to the Composition(s).

(d)   Any rights not specifically granted and set forth in this License are hereby reserved by the Owner.

3.   LICENSED TERM

    Licensee shall have the non-exclusive right to manufacture and sell records, tapes and compact discs derived from the Licensed Master in perpetuity.

4.     ROYALTIES

(a)     Licensee agrees to pay Owners a Record Royalty of **EIGHTEEN** percent **(18%)** of the retail list price ("Owners Basic Rate")  of all Records SOLD and NOT RETURNED, after all Licensee recoups from the sale of all Records all advance payments paid to Owner, and Owner's proportional share of recording costs, artwork charges, and promotional costs.

(b)     The specified percent royalty rate for a given Record embodying the Licensed Master shall be equal to a fraction of Owner's Basic Rate, the numerator of which is the total number of times the License master is embodied on the Compilation Album and the denominator of which is the total number of master recordings (including the Licensed Master) embodied on the New Record.

c)     In respect of Records sold outside of the United States, Licensee shall pay Owner a royalty at the rate of one-half (1/2) of the otherwise applicable "Basic Rate".

d)     Notwithstanding the foregoing:

i)     The royalty rate in respect of the sale of Records on a Mid-Priced Record Line shall be three-fourths (3/4) of the otherwise applicable "Basic Rate" as calculated in accordance with the foregoing provisions and the royalty rate in respect of the sale of Records on a Budget Record Line or Low-Priced Record Line shall be one-half (1/2) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions;

ii)     The royalty rate in respect of Records sold for use as premiums or in connection with the sale, advertising, or promotion of any other product or service shall be one-half (1/2) of the otherwise applicable "Basic Rate" as calculated in accordance with the foregoing provisions, and shall be based upon price received by Licensee for such Records sold by Licensee and upon the price utilized by Licensee's licensees in accounting to Licensee for such Records sold by Licensee's licensees;

iii) The royalty rate in respect of Records sold to the United States Government, its subdivisions, departments or agencies (including Records sold for resale through military facilities), and in respect of Records sold to educational institutions or libraries, shall be one-half (1/2) of the otherwise applicable "Basic Rate" as calculated in accordance with the foregoing provisions; and

iv)     The royalty rate in respect of Masters licensed by Licensee for a Record use on a flat-fee basis and for all other types of use (other than Record use) on a flat-fee or royalty shall be an amount equal to fifty percent (50%) of the net flat-fee or gross royalty, as the case may be, received by Licensee in respect of each such use.

e)     Notwithstanding the foregoing, no royalties shall be payable on Records

(i)     furnished as free or bonus Records to members, applicants, or other participants in any record club or other direct mail Distribution method;

(ii)      on Records distributed for promotional purposes to radio stations, television stations or networks, record reviewers or other customary recipients of promotional Records;

(iii)     on so-called "promotional sampler" Records; All promotional copies will bear a sticker "For Promotional Use Only" or "Not for Resale Use". Record Royalties will be paid directly to Owners at the address of Owners on this Agreement.

(iv)     on Records sold as scrap or so-called "cut-outs;

(v)      on Records distributed on a so-called "no-charge" or "free" basis (such as, but not limited to, Records commonly described in the record industry as "free-goods" or "freebies", and which shall be fifteen percent (15%) of the aggregate number of units of each LP or EP hereunder and it shall be twenty five (25%) of the aggregate number of units on each Single hereunder; or

(vi)     on Records sold at less than fifty (50%) percent of their regular wholesale price to Distributors, sub-Distributors, dealers, or others, whether or not the recipients of such Records are affiliated with Licensee and whether or not such Records are intended for sale by the recipients thereof.

     f)      Notwithstanding any of the foregoing:

          i)      For purposes of computing royalties there shall be deducted from the SRLP (or other applicable price, if any, upon which royalties are calculated) on Records hereunder an amount equal to any excise, sales, value-added, or comparable or similar taxes;

ii)      Royalties shall be computed and paid on one hundred (100%) percent of Net Sales for which payment has been received or credited.

iii)     Records Distributed in the United States by any of Licensee's affiliated branch wholesalers shall be deemed sold for the purposes of this Agreement only if sold by any such affiliated branch wholesaler to one of its independent third party customers.

     g)      All royalty rates in this Agreement are "all-in" rates, which is to say that they include all royalties due to Owners as well as any other artist, engineer, producer or other third parties.

5.      PAYMENT SCHEDULE

     (a)      Payment of accrued royalties shall be made within ninety (90) days after the close of each quarterly period being the 1st day of January for three months ending March 31; and on the 1st day of April for three months ending June 30 in each year; 1st day of July for three months ending September 30 in each year; and on the 1st day of October for the three months ending December 31 in each year to Owner at Owner's address set forth in this Agreement. However, Licensee shall have the right to deduct from the amount of royalties due any and all advance payments, recording costs, mastering charges, artwork charges, and promotional costs or any master use licensing fees paid to Owner hereunder.

(b)      All royalty statements, and all other accounts rendered by Licensee to Owner shall be binding upon Licensee, and not subject to any objection by Owner for any reason unless specific

objection in writing, stating the basis thereof, is given to us within one (1) year from the date rendered and unless an action, suit or proceeding is commended against Licensee in a court of competent jurisdiction within one (1) year from the date such specific objection is made in writing.

(c)     In computing royalties hereunder, Licensee shall have the right to withhold reasonable reserves for record returns and for credits of any nature. Such reserves shall not be greater than thirty percent (30%) of the monies otherwise due to you as royalties in connection with such records, and we agree to liquidate the reserves within two accounting periods subsequent to the accounting periods in which the reserves were originally withheld.

(d)     No royalties shall be payable to Owner in respect of sales of Records by any of Licensee's licensees until payment therefore has been received by Licensee or credited to Licensee's account. Sales by any such licensees shall be deemed to have occurred in the semi-annual accounting period during which such licensees shall have rendered to Licensee accounting statements for such sales.

6.     ACCOUNTING

Licensee shall maintain books of account concerning the sale of Records hereunder. Owner or a certified public accountant, in Owners behalf, may, at Owner's sole expense, examine Licensee's said books (relating to the sale of Records hereunder) solely for the purpose of verifying the accuracy thereof, only during Licensee's normal business hours and upon reasonable written notice. Licensee's books relating to any particular royalty statement may be examined as aforesaid only within one (1) year after the date rendered and Licensee shall have no obligation to permit Owner to so examine Licensee's such books relating to any particular royalty statement more than once.

7.     RIGHTS RETAINED BY OWNER:

Owner will retain all rights in and to the Licensed Masters excepts as is granted in this Agreement.

8.     RESTRICTIONS: This license does not include any right or authority

(a) to make changes or alter the Licensed Master.

(b) make any other use of the Licensed Master not set forth herein.

9.     WARRANTIES

(a)     Owners warrant they are the sole owners of the Licensed Masters and hereby have the right to grant the terms of this Agreement. Owners warrant it has been granted the rights in writing from all producers, artists, side artists and musicians for the intellectual property rights associated with the Licensed Masters.

(b)     All reproductions made from the Licensed Masters embodied in the New Record together shall be entirely the property of Licensee, free of any claims whatsoever by Owner or any person deriving any rights or interest from Owner or Artist. Such ownership in the reproductions or sound recording of the New Record shall not include ownership in the Licensed Masters which is solely owned by Owner.     Owner warrants it is the sole owners of the Licensed Masters and have been granted all rights associated with the recording of the Composition embodied on the Licensed Masters hereby have the right to grant the terms of this Agreement. The songs and

performances embodied in the Recordings, and any use thereof by Licensee or its grantees, licensees, or assigns, will not violate or infringe upon the rights of any third party.  Owner warrants it has secured all proper licenses for the right to perform and record all or any part of the performances or recording embodied on the Licensed Master for the use of a song or recording appearing in the Licensed Master from a "sample", an "interpolation" or a "replay".

10.    ASSIGNMENT

    Licensee shall not have the right to Assign this Agreement without the express written consent of Owner.

11.    INDEMNIFICATION Both parties indemnify and hold harmless the other party, its officers, agents, employees, attorneys and assignees, from and against any and all claims, damages, liabilities, costs and expenses including but not limited to attorney's fees, arising out of any breach by the other party of any representation, warranty, term or agreement made or to be performed by this Agreement.

12.    MISCELLANEOUS PROVISIONS

    (a)    This Agreement shall endure in perpetuity for the territory of the entire world,

    (b)    Any and all actions under the law shall be instituted in a court of competent jurisdiction in the State of NY and shall be deemed construed according to the laws of the State of NY.

(c)    Owner shall receive an appropriate credit in like kind to all others of the same stature on the jackets, labels, covers, long boxes or liner notes of Records embodying the Licensed Masters.

(d)    Owner agrees to issue any such licenses or written agreements to effectuate this Agreement if either is further required by Licensee or by Licensees assignors or licensees.

This Agreement shall be effective as of the first date set forth herein.

Copyright Owner: _____
            WONDERLUST DISC AND DIGITAL, MARY ABSHIER/ OWNWER

By: _____
    MARY PANJOMA P.K.A. PANJOMA

    PATRIK NILSSON P.K.A. PANJOMA

    RITCHN P.K.A. PANJOMA        Ritchard F. Napnerkowski

Address: 3211 DARNELL DRIVE
        AUSTIN, TEXAS, 78745

Licensee: _____

By: _____

**DON LICHTERMAN / HEAD OF SUNSET**

Address: 410 Park Avenue

15th Floor, Suite 1530

New York, NY 10022

## SCHEDULE "A"

Composition:   **Reel**

Artist(s):        **Panjoma**

## MASTER USE LICENSE

This agreement ("Agreement") made on the **24** day of **SEPTEMBER, 2010** by and between **MARY PANJOMA, PATRIK NILSSON, JOHN OUSLEY, P.K.A. PANJOMA** located at **3211 DARNELL DRIVE, AUSTIN, TEXAS, 78745** (hereinafter referred to as "Content Owner" and/or "Owners") and **SUNSET RECORDINGS, INC.**, located at 410 Park Avenue, New York, N Y 10022 USA (hereinafter referred to as "Licensee") for the following terms:

1.   LICENSE GRANTED:

   (a)   Whereby Owners are the owners of the certain master recordings described below. Owners, hereby grant to Licensee a non-exclusive license to use the master recording(s) embodying the performances of the artists(s) known professionally as PANJOMA _____ ("Artist") comprising the compositions (hereinafter "Compositions") listed on schedule "A" ("Licensed Masters(s)") annexed hereto and made a part of this Agreement, for the purpose of manufacturing, distributing and selling phonograph records, tapes and compact discs ("Records"). Under this Agreement Licensee is granted the limited right to include the Licensed Master(s): Subaquatic Cellular Supersmile in the following manner: **American Drug War: The Last White Hope (Sunset Urban)** (hereinafter "New Record").

   (b)   For and in consideration of the agreements set forth in this Agreement, Licensor agrees to pay Owner an advance in the amount of **$0.00**.
   Such payment shall be an advance against royalties payable hereunder and shall be charged against the record royalties or monies payable to Owner under this Agreement.

2.   RIGHTS GRANTED

   Owners hereby grant to Licensee the following right subject to the following:

   (a) The right to manufacture, distribute, sell, advertise, publicly perform and broadcast on a non-exclusive basis, Records containing the performance embodied in the Licensed Masters made hereunder.

   (b)   The right to use the names, likeness and a biography of Artist in connection with the advertising, publicizing or sale of Records manufactured therefrom. provided that Licensee shall be bound by any restrictions imposed upon Owners with respect thereto of which Licensee shall have been informed by Owners in writing at the time of signing this Agreement.

   (c)   Owners shall notify Licensee in writing at the time of executing this Agreement the owners of the Compositions and any Publishing Company owning any right to the Composition(s).

   (d)   Any rights not specifically granted and set forth in this License are hereby reserved by the Owner.

3.   LICENSED TERM

   Licensee shall have the non-exclusive right to manufacture and sell records, tapes and compact discs derived from the Licensed Master in perpetuity.

4.    ROYALTIES

(a)    Licensee agrees to pay Owners a Record Royalty of **EIGHTEEN** percent **(18%)** of the retail list price ("Owners Basic Rate")  of all Records SOLD and NOT RETURNED, after all Licensee recoups from the sale of all Records all advance payments paid to Owner, and Owner's proportional share of recording costs, artwork charges, and promotional costs.

(b)    The specified percent royalty rate for a given Record embodying the Licensed Master shall be equal to a fraction of Owner's Basic Rate, the numerator of which is the total number of times the License master is embodied on the Compilation Album and the denominator of which is the total number of master recordings (including the Licensed Master) embodied on the New Record.

c)    In respect of Records sold outside of the United States, Licensee shall pay Owner a royalty at the rate of one-half (1/2) of the otherwise applicable "Basic Rate".

d)    Notwithstanding the foregoing:

i)    The royalty rate in respect of the sale of Records on a Mid-Priced Record Line shall be three-fourths (3/4) of the otherwise applicable "Basic Rate" as calculated in accordance with the foregoing provisions and the royalty rate in respect of the sale of Records on a Budget Record Line or Low-Priced Record Line shall be one-half (1/2) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions;

ii)    The royalty rate in respect of Records sold for use as premiums or in connection with the sale, advertising, or promotion of any other product or service shall be one-half (1/2) of the otherwise applicable "Basic Rate" as calculated in accordance with the foregoing provisions, and shall be based upon price received by Licensee for such Records sold by Licensee and upon the price utilized by Licensee's licensees in accounting to Licensee for such Records sold by Licensee's licensees;

iii)    The royalty rate in respect of Records sold to the United States Government, its subdivisions, departments or agencies (including Records sold for resale through military facilities), and in respect of Records sold to educational institutions or libraries, shall be one-half (1/2) of the otherwise applicable "Basic Rate" as calculated in accordance with the foregoing provisions; and

iv)    The royalty rate in respect of Masters licensed by Licensee for a Record use on a flat-fee basis and for all other types of use (other than Record use) on a flat-fee or royalty shall be an amount equal to fifty percent (50%) of the net flat-fee or gross royalty, as the case may be, received by Licensee in respect of each such use.

e)    Notwithstanding the foregoing, no royalties shall be payable on Records

(i)    furnished as free or bonus Records to members, applicants, or other participants in any record club or other direct mail Distribution method;

(ii)    on Records distributed for promotional purposes to radio stations, television stations or networks, record reviewers or other customary recipients of promotional Records;

(iii)   on so-called "promotional sampler" Records; All promotional copies will bear a sticker "For Promotional Use Only" or "Not for Resale Use".  Record Royalties will be paid directly to Owners at the address of Owners on this Agreement.

(iv)    on Records sold as scrap or so-called "cut-outs;

(v)     on Records distributed on a so-called "no-charge" or "free" basis (such as, but not limited to, Records commonly described in the record industry as "free-goods" or "freebies", and which shall be fifteen percent (15%) of the aggregate number of units of each LP or EP hereunder and it shall be twenty five (25%) of the aggregate number of units on each Single hereunder; or

(vi)    on Records sold at less than fifty (50%) percent of their regular wholesale price to Distributors, sub-Distributors, dealers, or others, whether or not the recipients of such Records are affiliated with Licensee and whether or not such Records are intended for sale by the recipients thereof.

     f)    Notwithstanding any of the foregoing:

          i)    For purposes of computing royalties there shall be deducted from the SRLP (or other applicable price, if any, upon which royalties are calculated) on Records hereunder an amount equal to any excise, sales, value-added, or comparable or similar  taxes;

ii)    Royalties shall be computed and paid on one hundred (100%) percent of Net Sales for which payment has been received or credited.

iii)    Records Distributed in the United States by any of Licensee's affiliated branch wholesalers shall be deemed sold for the purposes of this Agreement only if sold by any such affiliated branch wholesaler to one of its independent third party customers.

     g)    All royalty rates in this Agreement are "all-in" rates, which is to say that they include all royalties due to Owners as well as any other artist,  engineer,  producer or other third parties.

5.    PAYMENT SCHEDULE

     (a)    Payment of accrued royalties shall be made within ninety (90) days after the close of each quarterly period being the 1st day of January for three months ending March 31; and on the 1st day of April for three months ending June 30 in each year; 1st day of July for three months ending September 30 in each year; and on the 1st day of October for the three months ending December 31 in each year to Owner at Owner's address set forth in this Agreement.  However, Licensee shall have the right to deduct from the amount of royalties due any and all advance payments, recording costs, mastering charges, artwork charges, and promotional costs or any master use licensing fees paid to Owner hereunder.

(b)    All royalty statements, and all other accounts rendered by Licensee to Owner shall be binding upon Licensee, and not subject to any objection by Owner for any reason unless specific

objection in writing, stating the basis thereof, is given to us within one (1) year from the date rendered and unless an action, suit or proceeding is commended against Licensee in a court of competent jurisdiction within one (1) year from the date such specific objection is made in writing.

(c)     In computing royalties hereunder. Licensee shall have the right to withhold reasonable reserves for record returns and for credits of any nature.  Such reserves shall not be greater than thirty percent (30%) of the monies otherwise due to you as royalties in connection with such records, and we agree to liquidate the reserves within two accounting periods subsequent to the accounting periods in which the reserves were originally withheld.

     (d)     No royalties shall be payable to Owner in respect of sales of Records by any of Licensee's licensees until payment therefore has been received by Licensee or credited to Licensee's account.  Sales by any  such licensees shall be deemed to have occurred in the semi-annual accounting period during which such licensees shall have rendered to Licensee accounting statements for such sales.

6.     ACCOUNTING

     Licensee shall maintain books of account concerning the sale of Records hereunder. Owner or a certified public accountant, in Owners behalf, may, at Owner's sole expense, examine Licensee's said books (relating to the sale of Records hereunder) solely for the purpose of verifying the accuracy thereof, only during Licensee's normal business hours and upon reasonable written notice.  Licensee's books relating to any particular royalty statement may be examined as aforesaid only within one (1) year after the date rendered and Licensee shall have no obligation to permit Owner to so examine Licensee's such books relating to any particular royalty statement more than once.

7.     RIGHTS RETAINED BY OWNER:

     Owner will retain all rights in and to the Licensed Masters excepts as is granted in this Agreement.

8.     RESTRICTIONS: This license does not include any right or authority

     (a) to make changes or alter the Licensed Master.

     (b) make any other use of the Licensed Master not set forth herein.

9.     WARRANTIES

     (a)     Owners warrant they are the sole owners of the Licensed Masters and hereby have the right to grant the terms of this Agreement. Owners warrant it has been granted the rights in writing from all producers, artists, side artists and musicians for the intellectual property rights associated with the Licensed Masters.

(b)     All reproductions made from the Licensed Masters embodied in the New Record together shall be entirely the property of Licensee, free of any claims whatsoever by Owner or any person deriving any rights or interest from Owner or Artist. Such ownership in the reproductions or sound recording of the New Record shall not include ownership in the Licensed Masters which is solely owned by Owner.        Owner warrants it is the sole owners of the Licensed Masters and have been granted all rights associated with the recording of the Composition embodied on the Licensed Masters hereby have the right to grant the terms of this Agreement. The songs and

performances embodied in the Recordings, and any use thereof by Licensee or its grantees, licensees, or assigns, will not violate or infringe upon the rights of any third party. Owner warrants it has secured all proper licenses for the right to perform and record all or any part of the performances or recording embodied on the Licensed Master for the use of a song or recording appearing in the Licensed Master from a "sample", an "interpolation" or a "replay".

10.    ASSIGNMENT

Licensee shall not have the right to Assign this Agreement without the express written consent of Owner.

11.    INDEMNIFICATION Both parties indemnify and hold harmless the other party, its officers, agents, employees, attorneys and assignees, from and against any and all claims, damages, liabilities, costs and expenses including but not limited to attorney's fees, arising out of any breach by the other party of any representation, warranty, term or agreement made or to be performed by this Agreement.

12.    MISCELLANEOUS PROVISIONS

(a)    This Agreement shall endure in perpetuity for the territory of the entire world,

(b)    Any and all actions under the law shall be instituted in a court of competent jurisdiction in the State of NY and shall be deemed construed according to the laws of the State of NY.

(c)    Owner shall receive an appropriate credit in like kind to all others of the same stature on the jackets, labels, covers, long boxes or liner notes of Records embodying the Licensed Masters.

(d)    Owner agrees to issue any such licenses or written agreements to effectuate this Agreement if either is further required by Licensee or by Licensees assignors or licensees.

This Agreement shall be effective as of the first date set forth herein.

Copyright Owner: _____

WONDERLUST DISC AND DIGITAL, MARY ABSHIER/ OWNWER

By: _____

MARY PANJOMA P.K.A. PANJOMA

PATRIK NILSSON P.K.A. PANJOMA

JOHN OUSLEY P.K.A. PANJOMA

Address: **3211 DARNELL DRIVE**
         **AUSTIN, TEXAS, 78745**

Licensee: _____

By: _____

   **DON LICHTERMAN / HEAD OF SUNSET**

Address: 410 Park Avenue
         15th Floor, Suite 1530
         New York, NY 10022

                                    **SCHEDULE "A"**


Composition:    **Subaquatic Cellular Supersmile**

Artist(s):      **Panjoma**